## The Attorney General ex rel. Bailey, appellant, and Moore's Executors, respondents.

1. The Court of Chancery has an extensive jurisdiction over the subject of charitable uses, to uphold, protect and enforce their execution ; but this jurisdiction is not so universal as to include the execution by the court of all trusts, or to authorize its interference in all cases of bequests to charitable uses. Its authority can only be invoked in exceptional cases, where no trustee is interposed, or where there is no person *in esse* capable of taking, or where the charity is of an indefinite nature, or its execution, according to the original purpose, is, or has become impracticable.

2. Where the charity is definite in its objects, and lawful in its creation, and capable of being executed according to the directions of the donor, and it is to be executed and regulated by trustees, whether they are private individuals or a corporation, the administration properly belongs to such trustees, and the king, as *parens patriæ,* has no general authority to regulate or control the administration of the funds. In all such cases, however, if there be any abuse or misuse of the funds by the trustees, the Court of Chancery will interpose, at the instance of the Attorney General, or the parties in interest, to correct such abuse. But in such cases, the interposition of the court is properly referable to its general jurisdiction as a court of equity to prevent abuse of a trust, and not to any original right to direct the management of a charity or the conduct of the trustees.

3. In construing an instrument by which a charity is created, the cases in which the religious faith of the founder is resorted to for the purpose of ascertaining his intent are, without exception, cases in which the primary object of the foundation was the propagation of religious doctrines, or the donor in the instrument of foundation has made some express provision relative to the religious instruction to be given. Where the charity is eleemosynary, and no directions on the subject of religious instruction are given, the religious opinions of the founder will be excluded from consideration, as affording no indication of an intention on which the court can act.

4. An eleemosynary charity is essentially unsectarian, both in its management and in the scope of its benevolence, and it can only become sectarian in either respect, when such restrictions or limitations are imposed by the declared intent of the donor in the instrument of foundation.

5. N. M., by his will, appointed R and G. executors, and devised and bequeathed to them all his estate, real and personal, in trust, to pay certain legacies, and with the balance of the estate to establish, in the fifth ward, in the city of N., an orphan asylum, "to be called St. James Roman Catholic Orphan Asylum," and also a hospital for sick and infirm persons, and directed his executors, or the survivor of them, as soon as might be conveniently practicable after the institutions should be established, to cause them to be incorporated under one incorporation, and to convey the

property to such corporation ; and that until such incorporation the executors, or the survivor of them, should have the management of the institution. One of the executors was a Protestant and the other the pastor of the St. James Roman Catholic church, where the testator was a stated worshipper. On an information and bill, filed at the instance of the Roman Catholic bishop of the diocese of Newark, asking that the court may declare that the intent of the testator was to cause the said asylum and hospital to be managed as Roman Catholic institutions, exclusively by Roman Catholic trustees, and subject to the spiritual visitation of the clergy of that church, and with the use of that form of worship, and teaching in all matters of religious instruction the doctrines and tenets of the Roman Catholic church. Held—

*First.* That the charity projected by the testator was an eleemosynary charity, and that the religious belief of the founder was not to be taken into consideration by the court in putting a legal construction on his will.

*Second.* That the existence of other institutions of a similar character, managed and controlled by Roman Catholics, of which the testator had knowledge, was not competent evidence to show an intent to make these institutions denominational in their management, there being nothing on the face of the will which showed a design to assimilate them to any other institutions established for similar purposes.

*Third.* That by the bequest the testator provided for an asylum and hospital for the general charitable purposes which such institutions are designed to promote, and that the right to establish them for the purposes specified, and to determine the manner in which they shall be organized, is vested in the executors, with no other restriction than that the institutions when established shall bear the proposed name ; and that they are not bound to place them under the direction of the Roman Catholic church, or to subject them to the visitation of the bishop or clergy of that church or to cause its worship to be adopted, or its tenets to be taught, exclusively or at all, except as their own judgment impels them.

6. Where the duty of a trustee is a matter of doubt, it is his right to ask and receive the aid and direction of a court of equity in the execution of his trust. In such cases, if reasonable grounds exist for coming into court to obtain the construction of the instrument creating the trust, the practice is to allow the costs and expenses, as it respects all the parties, and as between attorney and client, out of the trust funds.

7. The will should be read in the light of the circumstances surrounding the testator, putting ourselves in his place; and his religion and religious surroundings are competent, upon that principle, as lights to help ascertain the meaning and application of the language used. *Per* BEDLE, J.

8. Where the charity is created to promote a religious establishment, or religious education, and the intention is not expressed, or expressed in a very uncertain way, the religious belief of the founder is allowed to control, on the ground that it is presumed he intended some form of religious doc-

trine to be taught or supported, and that he could not have intended to propagate any other form than his own ; but that it is not a rule of construction, it is a presumption of the law, and although in an eleemosynary charity the religion of the founder could not in itself affect or control it, yet his religion and religious surroundings may be taken as lights upon the construction of the language of the will, whether such language was intended to give a religious and sectarian character or not. *Per* BEDLE, J.

9. An orphan asylum and hospital may be a secular charity merely, or it may be a part of a system to propagate and exemplify a particular religious belief; and in this case it is a question of intention in the will. By the language used, the testator intended this charity to be so established as that there should be a religious control by the Roman Catholics, but that no religious qualification is necessary in selecting the objects of the bounty. *Per* BEDLE, J.

This is an amicable suit, prosecuted by the relator who is the bishop of the Roman Catholic church of the diocese of Newark, against the defendants, who are the executors of the will of Nicholas Moore, late of the city of Newark, deceased. The will of the testator bears date on the 29th day of March, 1865. By it he gives, devises, and bequeaths to his executors, and the survivor of them, all the residue of his estate, real and personal, with full power to dispose of his real estate at public or private sale, and to make and execute all necessary conveyances for the same when sold. The gift was to his executors, and the survivor of them, in trust, for certain purposes therein enumerated. And after directing the payment of certain specific legacies thereout, the testator directed as follows : " Sixth. With the balance of my estate which may remain after executing the foregoing trusts, to establish, as soon as may be practicable after my decease, in what is now known as the fifth ward of said city of Newark, an orphan asylum, to be called St. James Roman Catholic Orphan Asylum, and also a hospital for sick and infirm persons. And my said executors, or the survivor of them, shall, as soon as may be conveniently practicable after the institutions shall have been established, cause them to be incorporated, one corporation for both institutions, and shall convey to the corporation, when created, all the property

belonging by assignment or appropriation of said executors, or the survivor of them, to the institutions. In the meantime, and until such incorporation, my executors, or the survivors of them, shall have the management of the institutions." The opinion of the Chancellor is reported in 3 *C. E. Green*, 256.

Mr. *C. Parker*, for appellant.

Mr. *J. P. Bradley*, for respondents.

The opinion of the court was delivered by

DEPUE, J.

The bequest being for the establishment of an orphan asylum, and a hospital for sick and infirm persons, is a bequest to a charitable use, and the object of this suit, as stated in the prayer of the bill, is to obtain from this court a construction of the will, and directions to the executors how best to carry out the design of the testator in regard to these charities.

The right of an executor, or trustee, or of any other person interested in the execution of a trust, to come into the Court of Chancery to have the trust established and the construction of the instrument by which it is created authoritatively settled, is a familiar doctrine of this court. The Court of Chancery has also an extensive jurisdiction over the subject of charitable uses, to uphold, protect, and enforce their execution. But this jurisdiction is not so universal as to include the execution by the court of all trusts, or to authorize its interference in all cases of bequests to charitable uses. Its authority can only be invoked in exceptional cases, where no trustee is interposed, or where there is no person *in esse* capable of taking, or where the charity is of an indefinite nature, or its execution according to the original purpose is, or has become, impracticable. Where the charity is definite in its objects, and lawful in its

creation, and capable of being executed according to the directions of the donor, and it is to be executed and regulated by trustees, whether they are private individuals or a corporation, the administration properly belongs to such trustees, and the king as *parens patriæ* has no general authority to regulate or control the administration of the funds. In all such cases, however, if there be any abuse or misuse of the funds by the trustees, the Court of Chancery will interpose, at the instance of the Attorney General, or the parties in interest, to correct such abuse or misuse of the funds. But in such cases the interposition of the court is properly referable to its general jurisdiction as a court of equity to prevent abuse of a trust, and not to any original right to direct the management of a charity or the conduct of the trustees. 2 *Story's Eq.*, § 1191. I have been thus particular in stating the jurisdiction of the Court of Chancery in matters of this kind, because we are asked by the prayer of the bill to direct the executors how best to carry out the design of the testator in regard to his charity; and much of the argument which was addressed to this court bore upon the question as to how the charitable institutions, proposed to be founded by the testator, might be most efficiently managed to effectuate the benevolent objects he had in view. Unless, by reason of the incomplete testamentary disposition of the testator, or the existence of the defects in, or difficulties in the execution of, the trusts above indicated, this court is called upon to frame a scheme for its execution in order to prevent a failure of the trust, we have no jurisdiction to inquire how the testator's bounty might be most judiciously administered, or to advise the executors how they shall exercise that discretion, which, to a certain extent, must be vested in every trustee in the management and administration of a trust. The jurisdiction of the court extends no further than to ascertain the intent of the testator, from the language he has used; and when such intent is ascertained, if the trust does not fall within the class of incomplete trusts, that require the aid of the Court of Chancery to sustain or

execute them, we have no jurisdiction to interpose, unless it be to restrain the executors from any proposed abuse of the trust or misuse of the trust funds.

In this case the charity is definite in its objects, and is capable of being executed according to the directions of the donor; and trustees for the establishment of the institutions are appointed, and provision is made for a corporation for the complete management of the trusts. It does not therefore come within the jurisdiction of chancery, by reason of any inefficiency of the scheme of the donor, or practical difficulty in its execution according to his directions, or for the want of competent trustees to carry it into effect.

It was admitted on the argument, and is not charged otherwise in the bill, that the executors are properly proceeding with the administration of the estate, and that they propose and intend with the residue of the estate, as soon as practicable, to establish in the fifth ward of the city of Newark an orphan asylum, which they propose to call St. James Roman Catholic Orphan Asylum, and also a hospital for sick and infirm persons; and that they propose and intend as soon as said institutions shall have been established, to cause them to be incorporated in one corporation, and upon such incorporation to convey to it the funds appropriated to those institutions, taking upon themselves the management of the institutions until such corporation is effected. This enumeration of acts proposed and intended to be done by the executors, comprises all the duties to be performed in the literal and complete execution of the trusts declared in the will. But it is said that the executors, while they propose to carry into effect all the directions of the will in their literal terms, meditate a violation of their duties as trustees, in that they propose with the trust funds to establish an orphan asylum and hospital purely charitable and of a general nature, in the management of which protestants will not be excluded, and in which the tenets of the Roman Catholic church will not be taught, or the forms of worship of said church be adopted, either exclusively or in preference

to those of any other religious denomination. And the charge in the bill is, that the intent of the testator was to create the two specified institutions for general charity, and for the reception and benefit of persons, without regard to religious belief, but to be under the control and management exclusively of the Roman Catholic church; in both of which, religious services should be had and religious instruction given, according to the tenets and form of worship of the Roman Catholic church; and that, in order to secure that result, the trustees managing said institutions, when incorporated, should be members of the Roman Catholic church, and the institutions should each be subject to the right of visitation for spiritual purposes, by the bishops and clergy of said church.

The intent to make these institutions denominational in their management, is sought to be deduced from the fact that the testator was, for a long while prior to his death, an earnest Roman Catholic, and a large contributor in the building of St. James Roman Catholic church in the fifth ward, in Newark, in which he was a stated worshipper; and that the charity cannot be rightly administered, as regards the asylum, without sectarian instruction; and that the hospital, to be properly carried on, requires the presence of nurses and religious ministers who may give consolation to the sick and dying. These considerations, it is urged, indicate that the testator, when he designated the name of the institution as St. James Roman Catholic Orphan Asylum, had reference to similar institutions which the Roman Catholic church had under its care, and manifested his intention that the asylum and hospital should be under Roman Catholic management, governed and carried on as Roman Catholics ordinarily govern and carry on like institutions.

It sufficiently appears from the preceding bequests in this will, that the testator was a Roman Catholic in his faith. But it will be found that the cases in which a consideration of the religious faith of the founder of a charity is resorted to for the purpose of ascertaining his intent, are without

2 U *

exception, cases in which the primary object of the founda-
tion was the propagation of religious doctrines, or the donor
in the instrument of foundation has made some express pro-
vision relative to the religious instructions to be given. In
*Attorney General* v. *Calvert*, 23 *Beav.* 258, Sir John Romilly
classifies charities, with a view to this subject, into ecclesias-
tical, educational, and eleemosynary charities, and says that
in ecclesiastical charities, the object being to promote reli-
gion, the opinions of the founder are of paramount import-
ance; in educational charities, the opinions of the founder
are only of value when some directions are given by him
relative to the religious instruction to be given to the pupils
to be taught, and only for the purpose of explaining and
elucidating any obscurity which may be found in such direc-
tion; in eleemosynary charities, the religious opinions and
tenets of the founder are wholly to be disregarded, and are
to be treated as forming no indication of his intention on
which the court can act.    In an earlier case before the same
judge, (*Attorney General* v. *Sherborne Grammar School*, 18
*Beav.* 256,) there is an illustration of an educational charity
where the court acted upon an intent that the charity should
be denominational, deduced from the instrument of founda-
tion.    That was a grammar school, established by King
Edward VI for the education, teaching and instruction of
boys and young men.    By the letters patent, the governors
named were created a body corporate, and were empowered
with the advice of the bishop of Bristol for the time being,
to make fit and wholesome statutes and ordinances in writ-
ing, relating to the ordering, governing, and directing, of
the master, sub-master, and scholars of the school.    The
regulations adopted by the corporation, with the approval of
the bishop, subjected the charity to Episcopal management.
In sustaining the power of the corporation to make such regu-
lations, the Master of the Rolls says: "Unless the clause in
the letters patent be excluded entirely from consideration, I
think it impossible to come to any conclusion other than this,
that the founder intended that the advancement of the doc-

trines of the Church of England, and the instruction and education of youth who belonged to that church, should be the primary object of his foundation, and that he sought to secure that object by providing that the rules for the government of the institution should receive the sanction of one of the prelates of that church."

*Shore* v. *Wilson*, which involved the construction of Lady Hewley's charities, does not conflict with the principle above stated. That charity was, first, for the relief of "poor and godly preachers of Christ's holy gospel," and the widows of such persons; second, for educating young men designed for the ministry of Christ's holy gospel; and, third, for the maintenance of an almshouse or hospital. By the rules made by her "for the better ordering, choosing, and government of the poor of the almshouse," which were referred to in the deed of gift, she described the persons to be admitted, as "poor and piously disposed of the protestant religion, that can repeat the Lord's prayer, the creed, and ten commandments, and Mr. Edward Bowles' catechism." The educational branch of the charity was primarily designed for the dissemination and propagation of religious doctrines, and the persons to be benefited by the alms to be dispensed were to be selected with reference to their religious faith. In order to ascertain the persons who were entitled to enjoy the benefits of the charity, the court had recourse to the sectarian associations and connections of the founder, not thereby to control the administration of the charity, but for the purpose of ascertaining the meaning of the ambiguous words used by the donor in defining the class of persons who were to be partakers of her bounty, on the ground that the words used by her were so indefinite and uncertain, that without resorting to their signification as used by the sect to which she belonged, and to the doctrines taught in the catechism referred to, the court could not understand what was meant by them; or, as was said by Lord Chief Justice Tindal, " for the purpose of making the written instrument speak for itself, which otherwise would be either a dead letter, or would use a doubtful tongue,

or convey a false impression of the meaning of the testator." 9 *Clark & Fin.* 355, 567 ; 11 *Sim.* 632, *note to Attorney General* v. *Shore ; Attorney General* v. *Wilson,* 16 *Sim.* 210 ; *Attorney General* v. *Drummond,* 1 *Con. & Lawson,* 210 ; *S. C., on Appeal,* 2 *Eng. L. and Eq.* 15–23 ; *Miller* v. *Gable,* 2 *Denio* 521, 540 ; *Robertson* v. *Bullions,* 1 *Kern.* 243. In a later case before Lord Cranworth, the learned Chancellor, in commenting on *Shore* v. *Wilson,* and *Attorney General* v. *Drummond,* uses the following language : " In Lady Hewley's case, and in the later case from Dublin, *Drummond* v. *Attorney General,* parol evidence was received only to enable the court to understand and construe the deed under which the trusts existed. The great question in the former case was as to what was the sense in which the words "godly preachers of Christ's holy gospel" were to be understood in the deed creating the trust ; and in the latter, the question was in like manner as to the meaning of the words " Protestant Dissenters." In both these cases, the parol evidence was necessary in order to enable the court rightly to understand the deed. Certain words were used which it was necessary to construe, and this could not be done without admitting a great deal of evidence as to the state of religious parties at the time when the deeds were framed. For such a purpose, the evidence was most reasonable. It was like the evidence afforded by a dictionary which enables us to translate a foreign language, or a book of science which gives us the meaning of words of art." *Attorney General* v. *Clapham,* 31 *Eng. L. and Eq.* 164.

The charity which was before the Court of Chancery of England, *In the matter of the Norwich Charities,* 2 *Mylne & Craig* 275, in the character of the bequest creating it, is similar to that now under consideration. The bequest was for establishing a hospital for keeping, bringing up, and teaching young and very poor children, who were without friends to help them, and for the helping and curing of poor, distressed men, women, and children, who should be hurt by falls or otherwise, or should be diseased and likely to be

cured. The testator was a member of the church of England. The Lord Chancellor held the charity to be not exclusively a Church of England charity, so as to make it proper to place it under the superintendence of a body of trustees consisting entirely of members of that church. The counsel who contended for the denominational aspect of the charity, pursued the same line of argument that was adopted here— the necessity that the children should be instructed in religion, and the presumption that the donor would not be indifferent as to what religious doctrines they should be taught. Lord Cottenham, C., disclaimed all right to proceed on such grounds in the selection of trustees to manage the charity, and said: "If I should say that the master was wrong in appointing the four trustees, who are not members of the church of England, I could only come to that decision upon the ground that I found something in the charter, or in the constitution of the charity, which would lead me to conclude that it was meant to be exclusively confined to the children of members of the church of England." In the course of his opinion the Chancellor states the rules by which the Court of Chancery is guided in the matter, as follows : " The master in selecting new trustees has, with my entire concurrence, whenever the charity was for church purposes, selected as trustees persons who were members of the church of England. It has been thought proper, that when the object of the trust has been exclusively connected with one particular religious party, the trustees who were to have the control over it, should be of the same religious party. The question is, what are to be considered church purposes? When I look to this foundation I can find nothing alluding to a church purpose; and I cannot hold, because I may have reason to suppose that Thomas Anguish, (the donor,) when he made his will in the year 1617, was a member of the Church of England, that, therefore, he intended that the only objects of his charity should be persons who belonged to the Church of England. He could easily have declared such an intention, if he entertained it."

It will be perceived that in *Attorney General* v. *Sherborne Grammar School*, the Master of the Rolls arrived at the conclusion that the charity in question was denominational in its management, by force of express directions of the donor, which indicated that the primary object of the charity was the advancement of certain religious doctrines, and the education of persons who possessed certain qualifications connected with the religious faith they professed. Another observation sustained by the cases is, that the courts in declaring that any eleemosynary charity is denominational in its management, in the absence of express directions as to the management and direction of the charity, are uniformly led to that conclusion by the circumstance that the benefits are to be enjoyed exclusively by persons of a particular religious belief. An eleemosynary charity is essentially unsectarian, both in its management and in the scope of its benevolence, and it can only become sectarian in either respect, when such restrictions or limitations are imposed by the declared intent of the donor in the instrument of foundation. A corporation created for the execution and administration of such a charity is a lay and not an ecclesiastical corporation, and, therefore, not subject to ecclesiastical visitation, even though composed of ecclesiastical persons, or provision is made in the instrument of foundation for the maintenance of priests within the hospital to celebrate divine service to the poor. 2 *Co. Lit.* 342, *a;* 1 *Black. Com.* 471, *and note.* "It is the object for which the house was established that makes it a spiritual or a lay foundation. If a hospital be established for the relief of the poor, and if there be no cure of souls attached to it, it is a lay foundation, though the founder has annexed, as a qualification of the office, that no person shall be master or warden of it except a clerk in holy orders." *Attorney General* v. *The Master and Brethren of the Hospital of St. Cross,* 21 *Eng. L. and Eq.* 397, *per* Sir J. ROMILLY, M. R.

The charity in this case comes within the legal designation of an eleemosynary charity. The propagation of religious

doctrines was not the primary object of the foundation. The purpose the testator had in view, was the establishment of an asylum and hospital for the benevolent purposes for which charitable institutions of that description are usually established. The principles upon which the cases cited above were decided, exclude from our consideration any reference to the religious faith of the testator in putting a legal construction on his will.

On the argument, some stress was put on the fact that the Roman Catholic church has many orphan asylums and hospitals under its care, with orders of men and women specially trained for this department of christian labor, one of which —the St. Mary's Orphan Asylum—is located in Newark; and it is charged in the bill, that the testator, when he directed the establishment of an asylum, to be called St. James Roman Catholic Orphan Asylum, had reference to like asylums governed and carried on under the control and management of Roman Catholics, with whose existence and character he was familiar. There is nothing on the face of the will that evinces any design to assimilate the asylum the testator projected, to other institutions established for like purposes. While it is allowable to construe a will by the four corners of the instrument, yet it is not permitted to the court to travel outside of it to annex provisions or introduce qualifications, or for any other purpose, except it be to ascertain the meaning of the language of the testator, where he has expressed himself in ambiguous terms. See *Colpoys* v. *Colpoys, Jacob* 451, *per* Sir THOMAS PLUMER, M. R.; *Shore* v. *Wilson,* 11 *Simons* 631, *per* TINDAL, C. J.; *Mann* v. *Ex'rs of Mann,* 1 *Johns. C. R.* 234 ; *S. C.* 14 *Johns. R.* 1. There is no ambiguity or uncertainty in the language in which this bequest is framed that requires the aid of averment; and we must be governed in ascertaining the intent by the words by which this charity is created.

It is not claimed by the relator that the charity was intended to be for the benefit exclusively of persons of the religious faith of the testator. The right of management and

control cannot, therefore, be claimed to be in persons of Roman Catholic connection, because of the charity being exclusively for the purposes of that church. It is admitted in the bill, that both the proposed institutions were intended to be for general charity, and for the reception and benefit of persons, without regard to religious belief. If they are to be subjected to the control exclusively of the Roman Catholic church, they must, therefore, have become so by force of some express directions in the will of the testator, touching their government and management.

Treating the orphan asylum as the main and controlling purpose of the charity, and viewing that as an educational charity, has the testator given any directions as to the religious instruction to be taught to those who shall be admitted to the asylum, or as to the management of either institution, with a view to the propagation or inculcation of any particular religious doctrines ? The affirmative of this proposition depends solely upon the name which he directs to be given to the asylum, which is the name of the church at which he worshipped, and whose pastor he selected as one of his executors. On this branch of the case, two cases (*Miller* v. *Gable*, 2 *Denio* 492, and *The People* v. *Steele*, 2 *Barb. R.* 398) were cited and much relied on. In both of these cases the charities were churches, established as religious societies. There was no dispute that the primary and sole object of their establishment was the dissemination of religious doctrines ; and the remark of the court, that in a grant to a religious corporation its distinctive denominational name, as descriptive of its ecclesiastical connection, was indicative of the particular religious tenets designed to be propagated, is applicable only to societies established for religious purposes.

The charity now under consideration is not an ecclesiastical charity, and the point of this case is not the inquiry whether the testator designed to make these institutions Protestant or Roman Catholic in their management and control, but whether he intended to subject them absolutely

to any denominational management, or designed that the entire administration of the charity, including its spiritual and educational as well as its purely eleemosynary duties, should be vested in the corporation to be organized under the direction of his executors in their discretion, without prescribing the religious faith of the persons under whose care the institutions should be placed, and by whom they should be managed.

It is obvious that if this charity is not an ecclesiastical charity, the name given to the institutions does not afford an indication of an intent to subject them to denominational control. They may bear the proposed name, and still retain their character as purely an eleemosynary charity. Especially is this the case when the testator has designated the instruments by which the charity is to be administered, without any qualifications as to the manner of administration. And if it be conceded that the name proposed does afford some indication of an intent to make the institutions denominational, it is exceedingly slight, and is overcome by the unmistakable evidence in the language of the bequest, of the trust and confidence reposed by the testator in his trustees. He selects as trustees two persons, one of whom is a protestant, and the other a priest of his own persuasion. He describes one as mayor of the city of Newark, and the other as pastor of St. James Roman Catholic Church, in Newark, and bequeaths and devises to them the estate out of which the fund for the charity is to be raised, absolutely and with full power of disposition. He directs that they shall establish these institutions, and when established, that they shall cause them to be incorporated, and that they shall have the management of them until incorporated; and he vests in the survivor the power to execute these trusts in case of the death of one. The testator has contented himself with declaring the objects of the charity, leaving the trustees to regulate its details and provide for its management in their discretion, with no other restriction on the exercise of that discretion than that the institution he provides for shall be

called St. James Roman Catholic Orphan Asylum.   If an act of incorporation is procured, expressed in the same language as is used by the testator in this bequest, in which the trustees named by him are named as corporators and managers, it would be impossible, by any known canons of construction, to so construe it as to make the institutions, when incorporated, denominational in their management, or subject to ecclesiastical visitation.   The scheme set forth in the proposed act of the legislature, annexed to the bill of complaint, and which is necessary to give this charity a denominational cast, illustrates the difference between the words of the bequest and the appropriate language to give expression to an intent to make an eleemosynary charity denominational in its management, and subject it to ecclesiastical visitation.

The only jurisdiction of the Court of Chancery over this charity is to decree the legal construction of the bequest, and to restrain the trustees from diverting the trust funds from the declared purposes of the trust.   Beyond that, we have no jurisdiction to direct or advise the trustees as to the manner in which they shall exercise their office as trustees, or regulate the internal management of the charity.   The considerations urged here, connected with the religious faith of the testator and the name of the institutions his benevolence projected, may properly be addressed to the executors to influence them in the conduct of these institutions while under their control, and in the constitution of the corporation by which the charity is finally to be administered; but they do not furnish the elements upon which this court can act in construing the will of the testator, to declare that he has given such directions on that subject that a departure from them will be a diversion of the trust funds from the declared objects of the trust, such as would require the interposition of this court to restrain the executors, or to punish them for a violation of their duty as trustees.

The conclusion is, that the testator has provided for an asylum and hospital for the general charitable purposes which such institutions are designed to promote, and that the right

to establish those institutions for the purposes specified, and to determine the manner in which they shall be organized, is vested in the executors, with no other restriction than that the institutions, when established, shall bear the name mentioned in the will; and that they are not bound to place them under the direction of the Roman Catholic church, or to subject them to the visitation of the bishop or clergy of that church, or to cause its worship to be adopted, or its tenets to be taught exclusively, or at all, except as their own judgment impels them.

The decree of the Chancellor appealed from, dismissed the bill with costs. The bill was filed at the instance of the executors, with the view of having the construction of the will settled by a decree of the court for their guidance, before the erection of suitable buildings for the purposes of the charity was commenced. Where the duty of a trustee is a matter of doubt, it is his undoubted right to ask and receive the aid and direction of a court of equity in the execution of his trust. *Kearney* v. *Macomb*, 1 *C. E. Green* 189. In such cases, if reasonable grounds exist for coming into the court to obtain the construction of the instrument creating the trust, the practice is to allow the costs and expenses, as it respects all the parties, and as between attorney and client, out of the trust funds. 1 *Redfield on Wills* 493 ; 3 *Daniell's Ch. Pr.* 1554. This case comes within the application of this principle. The costs, and a reasonable counsel fee on both sides, both in this court and in the Court of Chancery, should be allowed out of the trust estate; the amount of counsel fees to be settled by the Chancellor. In this respect the decree of the Chancellor is modified; in all other respects, it is affirmed.

BEDLE, J., dissenting.

A bill was filed in the Court of Chancery, in the name of the Attorney General, upon the relation of the Roman Catholic bishop of the diocese of Newark, for an authoritative

construction of a charitable trust in the will of Nicholas
Moore, deceased, late of the city of Newark. The testator
died July 1st, 1865, having made his will March 29th, 1865.
By it, after providing for the payment of his debts, he gives
$700 to his executors, out of which they are to pay his
funeral expenses, and the balance to pay to the pastor of St.
James Roman Catholic church in Newark, to be disposed of
by him at his discretion, for the benefit of his soul and
the soul of his deceased wife. He then gives and devises to
his executors, and the survivor of them, all the residue of
his estate, real and personal, *in trust*, first, to pay three
several legacies of small amounts, and then, in the fourth
place, to pay and appropriate $1000 for the building of an
altar in St. James Roman Catholic church aforesaid, and the
sum of $600 for the construction of two side windows in said
church, one to contain his name, and the other that of his
deceased wife; also, in the fifth place, to pay to St. Mary's
Orphan Asylum, then or lately located in Newark, (which
by the answer appears to be a Roman Catholic institution,)
the sum of $400, and then, as follows: "Sixth. With the
balance of my estate which may remain after executing the
foregoing trusts, to establish, as soon as may be practicable
after my decease, in what is now known as the fifth ward
of said city of Newark, an orphan asylum, to be called St.
James Roman Catholic Orphan Asylum, and also hospital
for sick and infirm persons; and my said executors, or the
survivor of them, shall, as soon as may be conveniently
practicable after the institutions shall have been established,
cause them to be incorporated, one corporation for both in-
stitutions, and shall convey to the corporation, when created,
all the property belonging by assignment or appropriation
of said executors, or the survivor of them, to the institutions.
In the meantime and until such incorporation, my executors,
or the survivor of them, shall have the management of the
institutions. Lastly. I hereby constitute and appoint Theo-
dore Runyon, now mayor of said city of Newark, and
Reverend John M. Gervais, now pastor of St. James Roman
Catholic church in Newark aforesaid, executors, &c."

The amount of the residue is not certain. The relator alleges that it will be about $40,000, and the executors say that they are now unable to state what the amount will be. The relator claims that the testator intended the two institutions to be of a denominational, religious character, that is, Roman Catholic. The executors claim that they are entirely secular charities, and to be managed without reference to any particular denominational regulation. No question is or can fairly be raised as to the duty of the Court of Chancery to see that trusts for the establishment of charities, such as are indicated in this will, are faithfully carried out. The intention of the founder must be observed. If it appears from the will that he intended these institutions to be under Roman Catholic religious regulation or management, this court has no option but to compel the executors to carry out that intention. What, then, did the testator intend concerning that? This, now, is simply a question of religious management, and not as to the extent of the charities, so far as those who are to be benefited by them are concerned. That will be hereafter considered. These charities, in their nature, are eleemosynary, and need not be under denominational control. Religious instruction and consolation, however, are fitting and proper in their management, and were the will entirely silent on this subject, it would not be presumed that religious education was intended to be excluded from the asylum, or religious privileges and comforts from the hospital. No such presumption as that is to be overcome in looking for the intention of the testator in his will. The only presumption that would arise, in the absence of any expression to the contrary, would be that he either intended his charities to be free from exclusive sectarian regulations, or that he was willing that those to whom the management was entrusted should exercise their discretion about it. And this is not a violent, stubborn presumption, for such charities are often under denominational control. They may be entirely secular, or they may be a part of the system recognized and fostered by a particular denomination to propagate

2 x *

its faith and practically exemplify it. The bill states "that the Roman Catholic church has many orphan asylums and hospitals under its care, with orders of men and women especially trained for this department of christian labor;" and that is distinctly admitted in the answer. The inquiry, then, fairly arises, did the testator, when he directed his executors to establish an orphan asylum and hospital for sick and infirm persons, mean such as are purely secular, and which might only be presumed to be so, or did he mean such as are analogous to those recognized and maintained under the patronage of the Roman Catholic church? This question, it is true, must be settled by the will itself, yet in reading it we ought to put ourselves in the place of the testator, with the light of the circumstances that surrounded him, and then see how the language of the will affects its subject matter. 1 *Jarman on Wills* 349, *note, ch.* 14.

That he was a Roman Catholic is admitted. His other bequests, excepting three inconsiderable legacies, show his attachment to that church. That church recognizes the maintenance of orphan asylums and hospitals, as a part of its christian labor. These facts, although of the religion and religious surroundings of the testator, are competent, under the well known principle of construction already stated, as lights to help ascertain the meaning and application of the language used. Religious opinions of the founder of a charity are sometimes admitted to control the objects of it, or the administration of the trust, where the charity is created to promote a religious establishment or religious education, and when the intention as to the religion to be promoted is not expressed, or expressed in a very uncertain way. In such cases the object being to promote religion, and it so appearing in the instrument of foundation, it has been presumed that the founder intended some particular form of religious doctrine to be taught or supported, and that he could not have intended to propagate any other form than his own. Hence, his own has been considered to control. This seems to be the principle announced by Sir John

Romilly in *The Attorney General* v. *Calvert,* 23 *Beav.* 258, and without controverting it, it is only necessary to say that it has no application to the rule of construction now invoked. Concisely stated, it is as follows : the object being to promote religion, some form was presumed to be intended, and hence his own was that form, unless expressed otherwise. That is not a doctrine of construction, but of legal presumption. The rule of construction referred to, is stated by Lord Chancellor Cottenham, in the case of *The Attorney General* v. *Shore,* in the House of Lords (11 *Sim.* 639), upon the admissibility of extrinsic evidence to ascertain the intention of Lady Hewley in her charities " to godly preachers of Christ's holy gospel," &c. After the delivery of the opinions of the learned judges, to whom the several questions in the cause had been referred, the Lord Chancellor, in moving the judgment of the house, uses this language : " Your lordships will have observed that in the discussion in the Court of Chancery, a very large range of evidence was admitted with a view of coming to a decision as to what was the intention of Lady Hewley, which could, after all, only be judged of by the language and views used in the deeds. In what respect and for what purposes this evidence was properly received, was the subject of one of the questions put to the learned judges, and has been the subject of some difference in their opinions. It does not appear to me necessary to consider minutely these differences, because I conceive that keeping strictly within those rules which all the opinions recognize, there is sufficient, upon the view taken by the great majority, to support the conclusion to which they have come upon the main point in the case. It was very clearly and shortly laid down by Mr. Baron Gurney, ' that that part of the evidence which goes to show the existence of a religious party, by which the phraseology found in the deeds was used, and in the manner in which it was used, and that Lady Hewley was a member of that party, is admissible;' that being in effect no more than receiving evidence of the circumstances by which the author of the instrument was

surrounded at the time." The principle is here laid down that the intention must be judged of from the instrument, and in the light of the circumstances surrounding at the time. Let us, then, take this familiar principle, with the circumstances surrounding the testator, and proceed to ascertain from the will the character of the charities intended. The asylum and hospital are mentioned as two institutions, yet he directs that they shall be incorporated as one—" one incorporation for both institutions." From this, it is evident he intended both to be under one management, and the reasonable construction of the clause, " an orphan asylum, to be called St. James Roman Catholic Orphan Asylum, and also hospital for sick and infirm persons," taken in connection therewith, is, that the asylum and hospital should be called St. James Roman Catholic Orphan Asylum and Hospital for sick and infirm persons.

Now, does this name mean anything, or is it delusive and senseless? Does it mean a secular charity purely, or such a charity as is well recognized by the Roman Catholic church, with which, as it appears, he was familiar? St. Mary's Orphan Asylum was an orphan asylum merely. That was Roman Catholic, and he gave to it. This charity is for orphans, and sick and infirm persons besides. Does he mean to have this charity just what he calls it, or something else? Names, like titles to acts of the legislature, may denote character and quality, or they may indicate but little. Whether either, depends much upon the name itself, and, in this case, upon how it is used. It is no uncommon thing to name institutions, whether educational, religious, political, or charitable, from individuals concerned in or connected with the general object of the institution. From that no particular quality can be drawn. Churches are often named after saints, and no denominational character may be deduced from it; but when in addition to that, a peculiar denominational name is added, as for instance, the St. James *Roman Catholic* church, no one could hesitate to believe that it meant what it said, that it showed as plainly as words could make it, that the church

that bore that name was a Roman Catholic church; and so of all other churches of any sect or creed. The name, whether Baptist, Episcopalian, Methodist, Presbyterian, or whatever religious sect it may be, is always considered as showing the denominational character of the church, and no one could reasonably think otherwise. Denominational names, so far as common observation goes, are only used to denote character or some quality when applied to church organizations, and to the common understanding the same rule would naturally apply to any organization that may be managed under some religious discipline, whether it be an orphan asylum, a hospital, or a school. The compound adjective, Roman Catholic, prefixed to either, would, according to natural and plain construction and understanding, give that peculiar quality to it. Those words would designate the kind of an institution it should be, just so far only as they would qualify the substantive. In the absence of words of quality, I concede that this charity would not be under denominational control as to religion, but when such words are given by which it shall be called as long as the institution shall survive, I cannot hesitate to believe that the founder intended that the object of his bounty should be just what he called it. It was suggested that the testator may have intended in the name he gave, to show his attachment and respect for the St. James Roman Catholic church, of which he was a member. Had he simply called his charity St. James Orphan Asylum and Hospital, there might have been some plausibility in the suggestion; but when he goes further and adds the name of a religious denomination, I cannot believe that simply to commemorate that church, he meant to have, for all time, the strange inconsistency of a denominational name to a charity only secular, particularly when no such intention is found in the will. What right have we to say that he did not intend that institution to be what he called it? Why should we not rather say that he *meant* what he called it, when a name so significant and characteristic is given? If we do not, then we surmise and

wonder why he should have fixed a designation so anomalous. Every effort to account for it like the one stated, takes us away from the terms of the will, and gives no solution that can satisfy or explain. This designation by name overcomes all presumption that the charity was only secular, by reason of any general words employed. It is not the policy of the law to raise violent presumptions to disconnect charities from religious denominations. Their management is often better and more earnest under the regulation of a particular faith, than under the common humanity of even enlightened society; still the presumption of the law should not be disturbed, except when a sufficiently distinct intention to the contrary is manifested. The intention of the founder is clear in this case, unless something is found in his will to indicate that he did not mean his institutions to be what he called them. Is there anything of that character?

The next direction is to incorporate them as one. This is proper and convenient for the management and perpetuity of the trust. A reference to the legislation of this state shows that St. Mary's Orphans Asylum, referred to in the testator's will, was incorporated March 10th, 1853, (*Laws* 1853, *p.* 405); and that, from the answer, is wholly under denominational management. Whether under Roman Catholic regulations or not, these institutions ought to be incorporated. But the chief reliance against any secular character, is in the fact that the testator directs that in the mean time, and until such incorporation, his executors, or the survivor, shall have the management of the institutions; and also in the fact that whilst one of the executors is a Roman Catholic, the other is a Protestant. The order of the executors' duties concerning this trust, as stated in the will, is as follows: First, to establish the institutions. That would comprehend their erection, and perhaps organization. Secondly, after their establishment, as soon as conveniently practicable, to cause them to be incorporated. Thirdly, to convey the property to the corporation. Now it might be, that between the establishment and incorporation there

would be some unavoidable delay ; and to meet that contingency, the right to manage was given to the executors, or their survivor.  Even with an intention that the institutions should be Roman Catholic, it is not strange that the testator should associate with the other executor, who is a clergyman, a lawyer occupying official position, for the settlement of his estate, and to hold, invest, and control the residue, in trust to be appropriated for the purposes intended.  Such duties require skill, integrity, and good judgment; and besides, legal knowledge, if not indispensable, was desirable, and likely to be sought for.  That executor is not selected in the will because he is a protestant, or even as mayor.  Reference to his office is only made as *descriptio personœ.*  He is selected as an individual.  What knowledge, if any, the testator had of his faith, at the time of the making of the will, does not appear, and nothing is shown, otherwise than that he was appointed as a competent, trustworthy, legal business man, who could be relied upon to carry out all the trusts of the will, in connection with the testator's pastor.  It is fairer to argue that because he appointed a Roman Catholic priest one executor, that he expected *he* would more immediately control the religious features of his bequests, leaving the other executor to attend to the strictly business parts of his trusts, than from the fact of the protestan'ism of the latter to infer that the testator did not mean the name of his charity to indicate the truth.  To establish and organize those institutions, if to be under Roman Catholic control, to incorporate them, and when incorporated to convey to the corporation, are not more inconsistent for a protestant, than to pay out money for the soul of the testator and his wife, or for the erection of an altar and memorial windows in a Roman Catholic church, or for the benefit of another Roman Catholic Orphan Asylum.  If the testator had confidence that he would do the one, he naturally could expect that he would do the other.  It is very apparent that any management the executors or the survivor might have to exercise, would only be temporary between the establishment and the

incorporation, and it would depend very much upon the executors themselves whether they or either of them would have to take the management at all. With proper action on their part, any such necessity could hardly be expected; and I see no reason why the testator could not have relied upon the lay executor to do whatever that necessity required of him, even if those in Roman Catholic orders or faith should control the religious management. We must be better satisfied, than from the disclosures of this case, that the testator had reason to believe his lay executor could not, in conscience, carry out one object of his trust as well as another, before we allow the simple fact that he was a protestant, with no evidence that the testator knew he had any protestant sectarian faith, to be used to overcome what I conceive to be a designation of what these institutions should be.

The idea that he intended a sectarian charity, at least in management, is also encouraged from the fact that he made no provision for its permanent support. It seems to be conceded, from the scope of the pleadings, that the estate is barely sufficient to establish the institutions with any reasonable capacity. He was familiar with the care exercised in his own denomination over this class of charities. He knew of their men and women qualified for that department of labor. And it is more reasonable to believe that in the absence of any provision for their support, he trusted to that liberality and care which were his immediate surroundings, rather than to promiscuous aid.

The view already taken is entirely inconsistent with the idea that he intended to leave all questions of religious management to his executors, from the general nature of their powers. But a word more as to that. The powers given certainly imply a large discretion, but they are entirely consistent with complete subordination to the quality or kind of charity that the name denotes. There is no clause necessarily implying an unlimited discretion in the executors, and I see nothing to encourage the belief that he intended them or the corporation to exercise their own discretion

whether the institutions should have any religious regulation or not, or what it should be.   When the will shows that he contemplated a particular kind of charity, all expressions concerning its establishment, although general when detached, must be construed in reference to that.   The will bears, to my mind, such convincing evidence of the kind of charities the testator contemplated, that I shall vote to declare that he intended his executors to establish those institutions in such a way as that they shall be under Roman Catholic religious control.

Who can participate in the benefit of these charities remains to be briefly referred to.   No provision being made to support them, the extent of their usefulness will depend upon the aid that the benevolent may extend to them, and therefore those in the management ought to have a large discretion on this question.   It does not follow that Roman Catholics alone are to participate in the benefit, because there is a Roman Catholic control in matters of religion; and without attempting now to abridge the discretion of the executors, it is only necessary to say that there is no intention disclosed in the will that Roman Catholic orphans, or the sick and infirm of that denomination, should alone be the recipients of the bounty.   In the case of *The Attorney General* v. *The Sherborne Grammar School, 18 Beav.* 256, (18 *Jur.* 636,) the Master of the Rolls makes the distinction between establishing a school for the education of youth of all denominations merely, and "regulating a school the primary object of which was to afford instruction and education to members of the established church, in such a manner as to enable families of dissenters to participate in their advantages;" and he further says, that "it does not follow because this is a Church of England school, that dissenters are to be excluded from all benefit of the instruction there given."   I am willing also to adopt the suggestion of the same learned Master of the Rolls, in the case of the *Attorney General* v. *Calvert,* (23 *Beav.*) already referred to, that "in eleemosynary charities, the presump-

tion is that he included all." Some of the charities in this case were subject to certain conditions not religious, others had duties of a religious nature connected with them, yet being all eleemosynary as to the benefit, the selection of the beneficiaries was held not to depend upon their opinions or denomination. They were of course subject however to the conditions and duties which the trusts required in the enjoyment of the benefit; and it was upon the question whether any religious qualification was required to enable persons to participate in the charities then under consideration, that the expression is found in the opinion of Sir John Romilly, that " in eleemosynary charities the religious opinions and tenets of the founder are wholly to be disregarded, and are to be treated as forming no indication of his intention on which this court can act." This remark is calculated to be misunderstood. It means only that the scope of the bounty in eleemosynary charities is not to be limited by the religious tenets of the founder. They form no indication that he intended to exclude any who were not qualified with his creed. It is not claimed by the relator that the objects of these charities should be selected with any reference to the Roman Catholic faith. The bill states the contrary; and such, I think, is the fair construction of the will. The court ought not to interfere in this respect with the discretion of whoever for the time being are the legal managers of the institutions, unless there should be such abuse as to seriously affect the fair operation of the trust.

The result to which I have come is, that the decree dismissing the bill should be reversed, and a decree be made declaring that the executors shall establish the institutions, so that there shall be a religious control by the Roman Catholics, the whole mode and all the details in the performance of that duty to be left to the discretion of the executors or the survivor, and also that in selecting the persons to be benefited by the charities, no religious qualification is necessary.

The decree was affirmed by the following vote:

*For affirmance*—BEASLEY, C. J., DEPUE, ELMER, OGDEN, OLDEN, VREDENBURGH, WOODHULL. 7.

*For reversal*—BEDLE, DALRIMPLE, CLEMENT, KENNEDY, VAIL, WALES. 6.